## MANUFACTURERS' LIFE INS. CO. v. BRENNAN et al.

(Circuit Court of Appeals, First Circuit.    January 21, 1921.)

### No. 1426.

1. **Witnesses** ⟨⟩211(3)—**Testimony of physician as to cause of death held inadmissible.**

   In an action on a life policy, where doctor testified that he attended insured as physician seven or eight times, and during his last sickness, and that he had certified that the cause of death was pulmonary tuberculosis, the court properly excluded the question, "What were the symptoms that you noticed in Mr. B., in order to arrive at the conclusion that he died from tuberculosis?" there being no showing that plaintiffs had waived their rights under Rev. St. Porto Rico, par. 1408, subd. 4, and paragraph 1409, subd. 4, since the physician's testimony would have been grounded in large part on information acquired in attending insured as his patient.

2. **Witnesses** ⟨⟩185—**Statute as to privilege between physician and patient to be liberally construed.**

   Rev. St. Porto Rico, par. 1408, subd. 4, providing that physicians cannot be examined as to information acquired in attending a patient, is remedial, and is to be given a liberal construction.

3. **Appeal and error** ⟨⟩994(2), 995—**Credibility and weight of testimony for jury.**

   Credibility and weight of testimony is a matter for the jury, and not an appellate court, to deal with.

   Johnson, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of Porto Rico; Peter J. Hamilton, Judge.

Action by Sofia Brennan y Grau and others against the Manufacturers' Life Insurance Company. Judgment for plaintiffs, and defendant brings error. Affirmed.

Manuel Rodriguez Serra, of San Juan, Porto Rico, for plaintiff in error.

Asa P. French, of Boston, Mass. (Frank Antonsanti, of San Juan, Porto Rico, on the brief), for defendants in error.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. The defendants in error (hereafter called plaintiffs) recovered judgment in the District Court of the United States for Porto Rico in an action brought by them as designated beneficiaries upon a life insurance policy, issued upon the life of James F. Brennan. The Insurance Company brought this writ of error, assigning as errors the exclusion of certain evidence offered by it and also the refusal of the District Judge to direct a verdict in its favor.

The principal defense set up by the Insurance Company was that Brennan in his application for insurance in answer to the inquiry whether he had ever had asthma, bronchitis, shortness of breath, coughing or spitting blood, answered, "No;" and also that in answer to the question, "Has there ever been anything to your knowledge or belief, in your condition or family, or personal history, occupation or habits, which renders a risk on your life more than usually hazardous, or

that tends to impair your constitution or to shorten your life?" again answered "No;" when, as is alleged, Brennan was at that time suffering from pulmonary tuberculosis, and had knowledge of his condition.

The application was dated October 31, 1916; the medical examiner's report, November 1, 1916; the policy, November 24, 1916, although it was not delivered until some days later. Brennan died on December 8, 1916. The policy contains the following provision:

"This policy, with the application therefor, constitutes the entire contract, and is based upon statements made by the insured which shall, in the absence of fraud, be deemed representations and not warranties."

Brennan was in his thirty-seventh year. The medical examiner certified that his chest was normal, the respiratory murmur clear and normal on both sides, the respiration at the rate of 17 per minute; that auscultation and percussion of the chest revealed no evidence of present or past disease in either lung or the pleura; that the examiner examined the naked chest and back; that the rate of his pulse was, sitting, 75, standing, 77, good, normal; that from the physical examination the examiner considered the risk first-class. There is no charge of fraud against the medical examiner.

The chief questions raised by the Insurance Company's assignments of error grow out of rulings made by the District Court under Revised Statutes of Porto Rico, pars. 1408, 1409, §§ 40, 41, the relevant portions of which are as follows:

"A person cannot be examined as a witness in the following cases: * * *

"4. A physician or surgeon or the assistant of either of them cannot, without the consent of the patients, be examined in a civil action as to any information acquired in attending the patient, which was necessary to enable the physician or surgeon to prescribe or act for the patient; but this subdivision does not apply in an action between a physician or surgeon and his patients in which the treatment of the patient by the physician or surgeon is in issue: And provided, that a physician or surgeon is competent to testify as to the cause of the death of any person."

Section 41 provides:

"Consent to the giving of such testimony as is mentioned in section forty is conclusively implied in the following cases: * * *

"4. In an action brought by the beneficiary to recover on a policy of life insurance, taken out by the person whose life was insured, a physician or surgeon may, with the consent of the beneficiary, testify as to any information acquired by him in attending the deceased, but must not be compelled to so testify.

"Nothing in this section contained affects the right of the court to admit any of the testimony mentioned in section forty-nine, when no objection is seasonably interposed thereto, or when the court finds, as an inference from proper evidence, that the consent mentioned in that section has been given or implied."

[1] The first assignment is that the court erred in not allowing Dr. Glines to testify at length and fully as to the cause of Brennan's death. Dr. Glines testified that he had been a practicing physician for 13 years, 10 of which have been spent in Porto Rico; that he had seen Brennan familiarly often since 1911, and had attended him as physician seven or eight times, including two or three times during his last sickness; also,

without objection, that he had certified that the cause of Brennan's death was pulmonary tuberculosis.

Counsel for the insurance company then addressed to Dr. Glines as an expert a series of questions intended to bring out the reasons for his opinion that Brennan died of pulmonary tuberculosis. The following will serve as a fair type of these questions:

"Doctor, what were the symptoms that you noticed in Mr. Brennan, in order to arrive at the conclusion that he died from tuberculosis?"

On plaintiff's objection, this question was excluded, and the defendant duly excepted. We think the ruling was right.

Plainly there was no evidence warranting the court in finding or ruling that the beneficiaries had waived their rights under the statute. It is equally plain that, if Dr. Glines had been permitted to answer this question, and, as the assignment of error sets forth, "to testify at the trial at length and fully as to the cause of death of James F. Brennan," he would have grounded his testimony in large part, if not entirely, upon information acquired by him in attending Brennan as his patient, and presumably necessary to enable him to prescribe for that patient.

The defendant's main contention is that the language at the end of section 40, paragraph 4, supra, "And provided, that a physician or surgeon is competent to testify as to the cause of the death of any person," is to be construed as admitting evidence, not only of the cause of death, but of all the reasons which led the attending physician to the conclusion stated.

To sustain this contention would be to disregard and to nullify the necessary import of section 41, paragraph 4, supra. The two provisions must be construed together. The later provision, to the effect that in suits like this, brought upon a life insurance policy, the attending physician "may with the consent of the beneficiary testify as to any information acquired by him in attending the deceased, but must not be compelled to so testify," would be nullified, if the language quoted above, at the end of section 40, paragraph 4, is to be given the broad construction now contended for. If Dr. Glines was, under section 40, paragraph 4, competent to testify as to the reasons which led him to believe that Brennan died of tuberculosis, including information obtained from Brennan's statements, or from his examination of Brennan's person, the right of waiver contemplated by section 41, paragraph 4, as accruing to the beneficiaries, would be utterly destroyed; they would have no right left to waive.

[2] A brief consideration of the history and construction of similar legislation in the United States confirms us in the view that no such broad construction can be given to the proviso at the end of section 40, paragraph 4. Statutes similar or analogous to the above quoted statute of Porto Rico have, beginning with New York in 1828, been enacted in many of our states. The history of this innovation upon the common law of evidence, with a reference to many of the statutes, is set forth in 4 Wigmore's Evidence, §§ 2380–2391. Mr. Wigmore criticizes the legislative policy underlying this exception to the common law rules of admitting evidence. But the exception is firmly established. Moreover, the statute is held a remedial statute and hence to be given

a liberal construction. Compare Buffalo, etc., Co. v. Knight Templars', etc., Association, 126 N. Y. 450, 455, 27 N. E. 942, 943 (22 Am. St. Rep. 839), where Judge Andrews said as to the analogous statute in New York:

"The statute should have a broad and liberal construction to carry out its policy. By reasonable construction it excludes a physician from giving testimony in a judicial proceeding in any form, whether by affidavit or oral examination, involving a disclosure of confidential information acquired in attending a patient, unless the seal of secrecy is removed by the patient himself."

See, also, Edington v. Insurance Co., 67 N. Y. 185, where the policy of the statute was discussed at considerable length. It was there held that the statute, "being remedial, should receive a liberal interpretation, and not be restricted by any technical rule."

But when these statutes, intended for the benefit of the patient, were, by the death of the patient under suspicious circumstances, sought to be invoked to prevent the disclosure of evidence perhaps proving crime, embarrassing questions were presented. Literally interpreted and broadly applied, the physician, attending a person dying of poison administered by a third party, could not be permitted to testify to facts indicating the cause of death. This problem was presented to the court in the Carlyle Harris Case, 136 N. Y. 423, 448, 33 N. E. 65, where it was invoked in the trial of a defendant, charged with murder by poison. The court there held, following Pierson v. People, 79 N. Y. 424, 432, 35 Am. Rep. 524, that the statute should not be so construed as to prevent a physician attending the deceased in his last illness to testify to information and circumstances tending to show the commission of crime, or that the death was caused by murder. It is there pointed out that, if the statute were to be construed as contended for in that case by the prisoner's counsel, it would be—

"extremely difficult, if not impossible, in most cases of murder by poison to convict the murderer. Undoubtedly such evidence has been generally received in this class of cases, and it has not been understood among lawyers and judges to be within the prohibition of the statute."

To the same general effect is People v. Lane, 101 Cal. 513, 516, 36 Pac. 16, 17, where the court said:

"The statutory privilege was not conferred to shield a person charged with the murder of another."

The same construction was adopted by the Iowa court in State v. Grimmell, 116 Iowa, 596, 600, 88 N. W. 342. It is there also pointed out that difficult questions have arisen out of the construction of these statutes in cases where it has been sought to introduce the evidence of attending physicians as to the mental capacity of deceased patients in will cases, and in proceedings on policies of insurance, or in prosecutions for killing by poison or by abortion.

Compare Shuman v. Sup. L. K. of H., 110 Iowa, 480, 483, 81 N. W. 717; Winters v. Winters, 102 Iowa, 53, 56, 71 N. W. 184, 63 Am. St. Rep. 428; Denning v. Butcher, 91 Iowa, 425, 59 N. W. 69; Westover v. Insurance Co., 99 N. Y. 57, 1 N. E. 104, 52 Am. Rep. 1; Mor-

ris v. Morris, 119 Ind. 341, 343, 21 N. E. 918; In re Flint, 100 Cal. 391, 34 Pac. 863; Harrison v. Railway Co., 116 Cal. 156, 47 Pac. 1019.

In Olson v. Court of Honor, 100 Minn. 117, 110 N. W. 374, 8 L. R. A. (N. S.) 521, 117 Am. St. Rep. 676, 16 Ann. Cas. 622, the court dealt with the application of a similar statute in an insurance case, where the insured was alleged to have committed suicide while under treatment for insanity. The policy covered cases of unintentional self-destruction, while insane. The Minnesota statute (Gen. St. 1894, § 5662, subd. 4) provided that a regular physician cannot, without the consent of his patient, be examined in a civil case as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient. The insurance company invoked this statute to exclude evidence of the attending physician tending to show that the insured was insane. But the court rejected this construction as unreasonable and unjust. The court said:

"The adjudged cases, however, relevant to this question, are not in entire harmony, due, perhaps, to a difference in the wording of the several statutes construed."

Some of these conflicting authorities are cited in that case.

In Davis v. Supreme Lodge Knights of Honor, 165 N. Y. 159, 58 N. E. 891, the court held that the certificate of an attending physician, filed with the city board of health, as to the cause of death of certain relatives of the insured, is inadmissible under the New York Statute (Code Civ. Proc. § 834) in an action upon a policy of life insurance defended upon the ground of a breach of warranty that such relatives had not died of consumption.

In Buffalo, etc., Co. v. Knights Templar, 126 N. Y. 450, 27 N. E. 942, 22 Am. St. Rep. 839, the court said this statute should have a liberal construction and that—

"By reasonable construction it excludes a physician from giving testimony in a judicial proceeding in any form, whether by affidavit or oral examination, involving a disclosure of confidential information acquired in attending a patient, unless the seal of secrecy is removed by the patient himself."

In civil cases, with few, if any, exceptions, the statute has been construed as protecting the privilege. The Porto Rico statute is in terms limited to civil proceedings.

In Renihan v. Dennin, 103 N. Y. 573, 580, 9 N. E. 320, 322 (57 Am. Rep. 770), the court by Earl, J., said:

"It is probably true that the statute, as we feel obliged to construe it, will work considerable mischief. * * * In actions upon policies of life insurance where the inquiry relates to the health and physical condition of the insured, it will exclude the most reliable and vital evidence which is absolutely needed for the ends of justice. But the remedy is with the Legislature, and not with the courts."

Compare, also, Edington v. Insurance Co., 67 N. Y. supra.

In the light of this brief sketch of analogous legislation and the difficulties arising in its construction, we can have no doubt that the proviso at the end of section 40, paragraph 4, was not intended to open the door to evidence of information acquired by a physician in attending a deceased policy holder.

The Porto Rican statute was obviously intended to be so framed as to avoid the doubts and difficulties encountered by various courts in the United States, in construing and applying earlier analogous enactments, while protecting in all essential particulars the privilege grounded on the confidential relation of physician and patient. Whether perfection in that regard has been attained may well be doubted. But it is enough now to hold, as we do, that, construed in the light of experience elsewhere and in connection with section 41, paragraph 4, the proviso at the end of section 40, paragraph 4, cannot be given the broad scope and meaning required in order to admit Dr. Glines' evidence sought to be elicited by the questions excluded.

It is not necessary on the record before us to undertake to determine the exact meaning to be given to the words "cause of death." Whether "cause of death," as used in the statute, is to be construed as opening the door for the admission of evidence as to the specific disease causing death, or whether it should be more narrowly limited— as, for instance, that the deceased died a natural death, or by poison, or by drowning, or by violence, self-inflicted or by a third party—is not now before this court. The Insurance Company, at least, was not prejudiced by the admission of Dr. Glines' testimony that Brennan died of tuberculosis. Evidence as to his reasons for this opinion was properly excluded.

The other assignments of error may be briefly disposed of as covered nearly, if not quite, by what has already been said.

Error is assigned because the evidence of Dr. Honorio Carrasquillo was on the plaintiff's motion struck out. Dr. Carrasquillo's testimony in effect, was that he was a bacteriologist, employed in laboratory work as an interne in the Presbyterian Hospital in San Juan, where in late August or early September, 1915, Brennan called on him to make an examination of his sputum. Brennan was brought to him by Dr. Hildreth, the medical director of the hospital; but Carrasquillo did not know whether Brennan was or was not a patient of Dr. Hildreth. His evidence tending to show that Brennan's sputum at that time indicated tuberculosis was, after Dr. Hildreth testified that Dr. Carrasquillo was an assistant under his direction, as to any patient coming to the hospital, on the plaintiff's motion struck from the record.

The statute supra covers in terms, not only the attending physician, but the assistant of the attending physician. While the record is possibly somewhat obscure, we think the trial court was correct in holding that the objection to the assistant's testimony had not been waived, and also that when, on Dr. Hildreth's testimony, it plainly appeared that Dr. Carrasquillo was an assistant of Dr. Hildreth, and that Brennan had consulted Dr. Hildreth as a physician, the statute required the exclusion of Dr. Carrasquillo's evidence.

[3] The defendant's contention that the court should have ordered a verdict in its favor is clearly without merit. The issue here grows out of representations, not warranties, as to Brennan's health and knowledge concerning it. On such an issue, only an extraordinary state of the evidence would warrant the court in ordering a verdict. In the present case, the record discloses a sharp conflict as to Brennan's

previous state of health and his knowledge concerning it. His wife and at least two other witnesses gave evidence strongly tending to show that he neither had nor supposed that he had tuberculosis. It was for the jury to deal with the credibility and weight of this testimony.

We have examined the other assignment of error, but find therein no reversible error.

The judgment of the District Court is affirmed, with costs to the defendants in error.

JOHNSON, Circuit Judge (dissenting). I cannot concur in the construction placed upon the statute of Porto Rico, because I think it completely nullifies the plain, unambiguous language of the last provision of paragraph 4 of section 40, and also any conceivable intent which the Legislature may have had in enacting it.

In terms the statute applies only to civil actions, and by it a physician or surgeon is not prohibited from testifying in a criminal case as to any information acquired by him in treating a patient.

The analogous statutes which were construed by the court in Pierson v. People and People v. Harris, cited in the majority opinion, did not in terms apply to civil actions alone, and the court, in them, had before it the question whether, in a criminal action, a physician who had attended the accused could testify from any information received by him while the relation of physician and patient existed, and held that he could.

The Legislature of Porto Rico, having provided that the statute enacted by it should apply only to civil actions, could not have added the last provision of paragraph 4 for the purpose of making a physician or surgeon who had viewed a dead body or performed an autopsy, competent to testify in a civil action, because only the physician or surgeon who had acquired information "in attending the patient which was necessary to enable the physician or surgeon to prescribe or act for the patient" is prohibited from testifying. Harrison v. Sutter Street Railway Co., 116 Cal. 156, 167, 47 Pac. 1019.

Clearly, without the concluding provision of paragraph 4, a physician who had examined a dead body could testify as to information obtained from such examination and state his opinion as to how death was caused, for there could be no relation of physician and patient between him and the dead.

The statute of Porto Rico was evidently copied from section 1881, paragraph 4, of the Code of Civil Procedure of California, after its amendment in 1901 (St. 1901, p. 242), and before its amendment in 1911 (St. 1911, p. 1135), and is practically identical with it, except in the last provision. This, in the California statute, was as follows:

"And provided, that in an action brought under sections 376 and 377 [for death by wrongful act], a physician or surgeon is competent to testify as to the cause of the death of the deceased."

It is evident that the Legislature of Porto Rico, by changing this provision, gave the exception, which would make a physician competent to testify as to the cause of death, careful consideration, and was unwilling to limit it to suits to recover for death by wrongful act, but

intended it to apply to any action where it became material to prove the cause of death of "any person."

If this provision was not necessary to make a physician or surgeon competent to testify in a criminal action, or in a civil action, where the information upon which his testimony was based was obtained by viewing a dead body or performing an autopsy, or in any case where the the relation of physician and patient had not existed, it must have been the legislative intent to make a physician or surgeon competent to testify as to the cause of death of one who was his patient, and whom he attended in his last illness, and the cause of whose death it was his duty to report to the proper health officer.

The language of the provision is easily understood, and if this section stood alone it would not seem to admit of any doubt that it should be construed in accordance with this plain intent. But it must be construed in connection with section 41, enacted at the same time, as a part of the same statute, and effect given, if possible, to every part of each section.

Section 41 was copied bodily from section 1882 of the California statute, and is identical with it in all of its paragraphs. This section of the California statute was enacted in 1901 as an amendment to its statute relating to privileged communications, and the obvious reason for its enactment was that the Supreme Court of that state had held in Flint's Estate, 100 Cal. 391, 395, 34 Pac. 863, and in Harrison v. Sutter Street Railway Co., 116 Cal. 156, 47 Pac. 1019, following the decision of the Supreme Court of New York in Westover v. Ætna Life Insurance Co., 99 N. Y. 56, 1 N. E. 104, 52 Am. Rep. 1, that, when the patient had died, no one, not even a personal representative or heir, could waive the privilege; so that the beneficiary in a life insurance policy, in a suit upon the policy, could not show, by testimony of the physician who attended the insured, what his physical or mental condition was at any time.

Cases had arisen, as in Westover v. Ætna Life Insurance Co., supra, where, in a suit upon a life insurance policy, the company had defended upon the ground that the insured had voluntarily taken his own life, and the beneficiary attempted to show by a physician who had attended the insured that he was insane at the time of self-destruction; but it was held that the privilege "died with the patient," and could not be waived by the beneficiary, and the physician was not allowed to testify.

To prevent this injustice, section 1882 of the California statute was enacted. It was evidently adopted by the Legislature of Porto Rico for the same purpose, and could not have been intended to limit the broad, unqualified provision of the preceding section.

Very little assistance is afforded by decisions of the courts of New York or other states which have an analogous statute, because in none of them is there a provison like that in the statute of Porto Rico, which makes the physician or surgeon competent to testify as to the cause of death without any qualification.

If paragraph 4 of section 41 stood alone, it might be construed to prohibit a physician or surgeon who attended the insured in his last illness from testifying as to the cause of his death from any information

received in his treatment of him; but, when considered in connection with paragraph 4 of section 40, this construction would, I think, completely nullify the only purpose for which that provision could have been enacted.

To construe paragraph 4 of section 40 so narrowly as to restrict a physician, who had attended in his last illness a patient who had died from disease, to testifying as to the cause of death, solely from information received from the appearance of his dead body, uninfluenced by any symptom he had observed in the patient while living, would amount to its practical nullification, for it would require of the physician the impossible mental operation of separating all knowledge gained from symptoms observed in the patient while living from that which he acquired from the appearance of his dead body, before reaching a conclusion.

If paragraph 4, section 40, is construed in accordance with the plain, ordinary meaning of its language, to mean that a physician or surgeon is competent to testify as to the cause of death, whether he attended the deceased in his life time or not, and paragraph 4 of section 41 is construed as conferring upon the beneficiary the right to waive the privilege, so that a physician may testify as to the physical or mental condition of the insured at any time, but that his consent is not necessary to make the physician competent to testify as to the cause of death, effect can be given to both provisions. I think this is the construction that should be placed upon them, and that Dr. Glines not only was competent to testify as to the cause of death of Brennan, the insured, but also to give his reasons for the conclusion which he reached. Obviously he must have reached his conclusion from observation of symptoms of the disease which he testified caused Brennan's death, during the two or three days in which he attended him in his last illness and in his previous treatment of him; and having testified, without objection, that Brennan died from pulmonary tuberculosis, and what were the usual and most common symptoms of that disease, I think it was reversible error not to have allowed him to answer the question:

"Doctor, what were the symptoms that you noticed in Mr. Brennan, in order to arrive at the conclusion that he died from tuberculosis?"